## UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

|  |  |  |
|---|---|---|
| **IN RE:** | ) | |
| | ) | |
| **RUBY AUDEEN GREGORY,** | ) | **Case No. 10-50237** |
|     Debtor. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION DENYING WELLS FARGO'S MOTION TO ORDER DEBTOR TO DISMISS STATE COURT ACTION AND TO ENFORCE SWORN PROMISE TO SURRENDER PROPERTY TO WELLS FARGO OR OTHERWISE REAFFIRM OR REDEEM COLLATERAL</u>

The court is asked to consider the meaning of the word "surrender" in § 521(a)(2)(A)[1] in an unusual context: where a secured creditor obtains stay relief, fails to timely foreclose, and mistakenly releases its lien, and the debtor who stated she would surrender the real estate attempts to leverage that mistake into a possible windfall. For the reasons stated below, the court denies the creditor's motion to compel the debtor to "surrender" her real estate and to dismiss her state court case against the lender.

### *Findings of Fact*

The court makes the following findings of fact based on stipulated facts and exhibits.[2]

### *Description of the Real Estate Involved*

At the time Ruby Gregory filed a chapter 13 bankruptcy in 2010, she owned a home in Stanberry, Missouri, known as 317 N. Willow Street, with her daughter, Rita.[3] The property at

---

[1] All statutory references are to the United States Bankruptcy Code, Title 11, unless otherwise noted. All references to "Rules" are to the Federal Rules of Bankruptcy Procedure, unless otherwise noted.

[2] There are some factual disputes not addressed in the stipulation, and several discrepancies between the record and the stipulated facts, but none of the disputes or discrepancies is material or prevents the court from ruling on the motion as a matter of law. The court takes judicial notice of the existence of certain items in the record for the purpose of accurately setting forth the procedural background. *See, e.g., In re James*, 300 B.R. 890, 894 (Bankr. W.D. Tex. 2003).

[3] The Schedule A filed in 2010 does not disclose that Rita has any interest in 317 N. Willow, but an examination of the deeds of trusts and other information in the record reveals that Rita's name is on the deeds.

317 N. Willow is legally described in part as "Tract B."[4]    Ruby and Rita also owned the adjoining property, 313 N. Willow Street, legally described in part as "Tract A."[5] The property at 313 N. Willow is a lot with an abandoned structure.

Both properties were encumbered by deeds of trust securing a note Ruby executed in favor of Wells Fargo Financial Missouri several years earlier. Rita was not a signatory to the note, although she did sign both deeds of trust. The deeds of trust were properly recorded with the Gentry County, Missouri Recorder of Deeds. But here is where the trouble begins: apparently unbeknownst either to Ruby or to Wells Fargo at the time, the legal descriptions in the deeds of trust had been switched. The deed of trust for 317 N. Willow (Tract B, Ruby's home) listed the legal description for 313 N. Willow (Tract A, the lot); the deed of trust for 313 N. Willow (Tract A, the lot) listed the legal description for 317 N. Willow (Tract B, Ruby's home).

### Treatment of the Real Estate in the Chapter 13 Case

In Ruby's chapter 13 bankruptcy case, she listed 317 N. Willow as her street address and claimed the property as her partially exempt homestead.[6] She valued 317 N. Willow at $95,000, with a mortgage of approximately $100,000 owed to Wells Fargo. She did not list Rita as a co-owner of 317 N. Willow.

Ruby did not specifically schedule any property known as the lot at 313 N. Willow. Ruby did schedule a half-interest with her daughter Rita in property described as "Highway 169 1 Acre." Ruby scheduled the value of this property at $20,000, with a mortgage of $9,900 owed to U.S. Bank. It is not clear whether this second property is actually supposed to be the lot, 313 N.

---

[4] The full legal description of 317 N. Willow is "TRACT B: THE EAST ONE HALF (1/2) OF LOTS FOURTEEN (14), FIFTEEN (15), SIXTEEN (16) AND SEVENTEEN (17) ALL IN BLOCK FIFTEEN (15), STANBERRY, GENTRY COUNTY, MISSOURI."
[5] The full legal description of 313 N. Willow is "TRACT A: LOTS TWENTY (20) AND TWENTY-ONE (21), BLOCK FIFTEEN (15), CITY OF STANBERRY, GENTRY COUNTY, MISSOURI."
[6] Under Missouri law, a debtor may claim a homestead exemption of $15,000. MO. REV. STAT. § 513.475.

Willow, or whether the reference to U.S. Bank was intended to be Wells Fargo, and the parties unfortunately do not address this discrepancy in their stipulated facts.

In any event, Ruby's chapter 13 plan proposed to retain the property at 317 N. Willow and to cure Wells Fargo's mortgage arrears. With respect to the "Highway 169 1 Acre" property, the plan stated she would surrender it "in lieu of entire debt." The 313 N. Willow property was not addressed in the plan. After several plan amendments[7] without objection by any creditor or party in interest save the chapter 13 trustee, Ruby's plan was eventually confirmed.[8]

*Events Post-Confirmation*

Ruby did not complete her plan. After several suspensions of plan payments and motions to dismiss for default,[9] Ruby's chapter 13 case was dismissed for default in plan payments about two years after the case was filed.

Pending at the time of dismissal was Wells Fargo's motion for relief to lift the stay for cause under § 362(d)(1) as against both 313 and 317 N. Willow.[10] In the motion, Wells Fargo sought a waiver of the Rule 4001(a)(3) stay of execution. Specifically, Wells Fargo alleged it was not adequately protected and would be irreparably harmed if the stay were not lifted to allow it to "seek the return of [the] property." Only the chapter 13 trustee filed a timely response to

---

[7] Ruby filed six plans in total, each increasing the payment, to address both the higher-than-anticipated Wells Fargo arrears and the effect of the numerous suspensions and defaults on the plan length.

[8] U.S. Bank, purportedly the holder of a deed of trust on the "Highway 169 1 Acre" property, did not file a proof of claim except with respect to an unsecured credit card; Wells Fargo's secured proof of claim included as exhibits the deeds of trust for both of the N. Willow properties.

[9] Ruby suspended more than $21,000 in plan payments in response to three motions to dismiss filed by the chapter 13 trustee for default in plan payments. At the time Wells Fargo's motion for relief was filed in March 2012, the last mortgage payment the trustee had paid Wells Fargo was for the April 2011 payment.

[10] The parties do not address the specifics of the motion for relief in the stipulated facts, but, interestingly, Wells Fargo alleged it held a first deed of trust on 313 N. Willow (the lot), and a second deed of trust on 317 N. Willow (the home). Wells Fargo alleged that its deeds of trust were recorded, but did not allege that its liens were "properly recorded" or "perfected" or constituted a "first and prior lien," as is typical in motions for relief from stay. Wells Fargo also failed to request relief from the co-debtor stay protecting Rita under § 1301, and did not serve either Ruby or Rita with the motion. *See* FED. R. BANKR. P. 9014(b) (contested matters to be served in accordance with Rule 7004).

Wells Fargo's motion, but the court did not rule on the motion since the case was dismissed before Wells Fargo's motion for relief could be heard.

Three weeks after the dismissal, new counsel entered an appearance for Ruby and filed a motion to reinstate the case for the purpose of converting it to a chapter 7. The motion to convert alleged that Ruby had decided to surrender her "home"[11] since the payments were higher than she could afford.[12] The court[13] granted the motion to reinstate ex parte pursuant to local rule[14] and ordered conversion of the case to a chapter 7. The court also set a new deadline for parties to object to Wells Fargo's motion for relief.

Ruby then filed an amended petition and conversion schedules. The amended petition lists a street address of "3526 Highway 169 South, Stanberry, Missouri." Schedule A describes "3526 Highway 169 S." as one acre worth $20,000 secured by a lien of $9,900, owned one-half with daughter Rita. 317 N. Willow and 313 N. Willow are scheduled together with the description as "Lot with Abandoned Structure," valued in aggregate at $30,000, and secured by a lien of approximately $100,000.[15] Ruby claimed "3526 Highway 169 S." as her homestead;[16] no party objected. Rita's interest in the N. Willow properties was not disclosed.

---

[11] The motion did not specify which piece of property was the "home." The motion to convert also does not appear to have been served on Wells Fargo or other creditors; the certificate of service stated that the motion was served "upon all appropriate parties electronically by the U.S. Bankruptcy Court's ECF System."

[12] Wells Fargo's brief seizes upon the language in the motion to convert, arguing that the statement that the property would be surrendered was misleading and yet another "promise" the court should enforce. Ruby alleged in the motion she intended to surrender her "home," but given that she used a different address for her residence and claimed property other than the 317 N. Willow property as exempt, it is not at all clear what property was being surrendered. But even assuming that her counsel's statements in the motion to convert were misleading to Wells Fargo, those statements are not grounds for the relief Wells Fargo seeks. The statements in the motion are governed by Rule 9011, and Wells Fargo did not seek sanctions under Rule 9011 or comply with the safe-harbor provisions of the Rule. Statements by counsel in a motion should be distinguished from statements in a statement of intention signed by the debtor under penalty of perjury. *See* 28 U.S.C. § 1746; Rule 1007(b)(2); Rule 1008.

[13] The Honorable Jerry W. Venters, now retired.

[14] W.D. Mo. L.B.R. 9060-1.J.

[15] The description in the conversion schedules suggests that the "Highway 169 1 Acre" property is not 313 N. Willow, the lot with abandoned structure, and that Ruby actually owned three pieces of real estate. Again, the discrepancies between the original and amended Schedule A in terms of what real property Ruby owned has not been addressed by the parties, but is not material given that it is only 313 N. Willow and 317 N. Willow that are at issue in the motion.

It is Ruby's statement of intention, however, that has become important in the context of this dispute. With respect to 317 N. Willow and 313 N. Willow ("Lot with Abandoned Structure"), Ruby checked the box that said "Property will be . . . Surrendered." The separate verification form states: "**I** declare under penalty of perjury that the above indicates my intention as to any property of my estate securing a debt and/or personal property subject to an unexpired lease."[17]

In the meantime, the court entered an order granting Wells Fargo's motion for relief after no party objected. Wells Fargo's counsel filed a certificate of service stating he served the order on First National Bank of Omaha and a mortgage servicer in Florida (neither of whom appear to have any connection with the case); Ruby and Rita were not served. Ruby's chapter 7 trustee[18] filed a no-asset report, and Ruby received her discharge order in due course. In late September 2012, the case was closed.

***Events Post Chapter 7***

It is not clear from the record how long Ruby continued to live in the home at 317 N. Willow. The parties stipulated that "Ruby maintains" she has not regularly resided at 317 N. Willow since December 2015;[19] inspection records by Wells Fargo's agent attached to the

---

[16] There is nothing in the record or the parties' stipulated facts to indicate whether there was a structure that allowed Ruby to live on the one acre as the Missouri homestead exemption would require. *See* MO. REV. STAT. § 513.475.1 (requiring a "dwelling house").

[17] Ruby also stated she intended to surrender her claimed homestead, 3526 Highway 169 South.

[18] The stipulation states that the chapter 13 case was filed on March 18, 2010, and that Bruce E. Strauss was appointed as trustee. Richard Fink was appointed as the chapter 13 trustee; Mr. Strauss is the chapter 7 trustee.

[19] The court is not clear whether this stipulation is intended to mean that Ruby lived regularly at 317 N. Willow until December 2015. Ruby argues in her brief that she lived at 317 N. Willow until December 17, 2015, but that is not what she stipulated to, and she presented no other evidence. Also, although the parties stipulated Ruby listed her "primary residence" as 3526 Highway 169 South in the amended conversion petition, that is, strictly speaking, not what the petition states: it lists 3526 Highway 169 South as a "street address" and a P.O. box as the address for mailing. In sum, the court is left to surmise that Ruby lived at 317 N. Willow during the chapter 13; moved out when she converted the case to chapter 7 (since she claimed 3526 Highway 169 South as her homestead as of the date of conversion to chapter 7); and may have moved back to 317 N. Willow later, based on the vague stipulation. Likewise, the parties' stipulation that Ruby did not list any other prior addresses for the three years preceding the filing of the amended petition is also not strictly true, since the chapter 13 petition listed 317 N. Willow as her

5

stipulation reflect the house was vacant during inspections conducted in 2014 through sometime in 2015.

In any event, in July 2014, Wells Fargo sent a letter to Ruby addressed to 317 N. Willow with the subject line: "Release of secondary collateral used to secure your loan." The letter stated that Wells Fargo was releasing its lien on its secondary collateral, 313 N. Willow, but retaining its interest in the primary collateral, 317 N. Willow.

Wells Fargo had in fact recorded a "full deed of release" with the Gentry County Recorder of Deeds earlier in June 2014, before it sent the letter. The release states in the header that the property address of the deed of trust being released is 313 N. Willow; the body of the release directs the county recorder to "cancel of record said security instrument" and lists thereafter the legal description of Tract B (the description of 317 N. Willow).[20] Notwithstanding the release, many more months passed, during which Wells Fargo appears to have done nothing else to foreclose whatever interest it retained in either N. Willow property.[21] It is not clear when Wells Fargo discovered the errors in the deeds of trust and deed of release.

### *Ruby's State Court Action against Wells Fargo*

In March 2016, Ruby filed a four-count petition against Wells Fargo and its agent in Gentry County Circuit Court, Case No. GE-CC00033 (the "State Court Action"). The petition alleges generally that Wells Fargo, through its agent, broke into Ruby's home at 317 N. Willow,

---

[20] "street address." In any event, it is not necessary for resolution of this motion to decide when or if Ruby vacated 317 N. Willow, since the court's task is to decide the legal import of her statement of intention filed in April 2012, and when or if she vacated the property is not a fact necessary to decide that legal dispute.

[20] Ruby, then 81 years old, filed a mortgage complaint with the Consumer Financial Protection Bureau, stating in essence her belief that she had received a full deed of release, but that Wells Fargo had not released the lien on 317 N. Willow. She also complained that Wells Fargo's loan had been predatory. Wells Fargo's response to the CFPB stated it had released its interest in the "secondary property," but that its lien on 317 N. Willow was not released and the loan and lien remained "active." The parties do not address the status of Ruby's CFPB complaint.

[21] Under Missouri law, a secured lender may foreclose without a judicial foreclosure by merely noticing the foreclosure with a 20 day notice. *See generally AgriBank FCB v. Cross Timbers Ranch, Inc.,* 919 S.W.2d 263 (Mo. Ct. App. 1996); MO. REV. STAT. § 443.325.

changed the locks, and damaged the property. Ruby seeks actual and punitive damages, attorney

fees, and pre- and post-judgment interest for alleged trespass to land, trespass against chattels,

and violations of the Missouri Merchandising Practices Act.[22] Ruby also requested a declaratory

judgment that she owns 317 N. Willow (and all personal property inside) free and clear of Wells

Fargo's interest. She also demanded a jury trial.

Wells Fargo's answer generally denied Ruby's allegations, and asserted thirty-one

separately-enumerated affirmative defenses. Wells Fargo also counterclaimed against Ruby and

third-party "defendant" Rita.[23] Wells Fargo's counterclaim sought reformation of the legal

description in the deeds of trust and deed of release or in the alternative an equitable lien.

Notably, Wells Fargo did not request foreclosure of its interest.

### The Motion before this Court

It is unclear what transpired in the State Court Action after the counterclaim was filed,

but some six months later and more than four years after the bankruptcy case was closed, Wells

Fargo moved to reopen the bankruptcy case for the purpose of filing a motion to compel (the

"Motion to Compel").[24]

The Motion to Compel requests various forms of relief. It requests orders (1) requiring

Ruby to dismiss the State Court Action; (2) ordering Ruby to refrain from filing any further

claims against Wells Fargo relating to the N. Willow properties; (3) ordering Ruby to refrain

---

[22] MO. REV. STAT. § 407.010 *et seq.*

[23] It is not clear if Wells Fargo actually joined Rita as a third-party defendant; she is not a co-plaintiff with Ruby in the State Court Action, although she is a party to both deeds of trust, and has not been made a party to the motion to compel. *See* MO. REV. STAT. § 509.470.

[24] Before the time ran on Wells Fargo's motion to reopen, the Office of the U.S. Trustee filed its own motion to reopen under § 350 to allow the Chapter 7 trustee to administer newly discovered assets (the State Court Action and potential avoidance of Wells Fargo's liens). The court granted the motion ex parte pursuant to local rule, which mooted Wells Fargo's motion. Wells Fargo then filed the instant Motion to Compel. In addition to contesting Wells Fargo's Motion to Compel, Ruby filed a motion to "enjoin" Wells Fargo from filing any further motions in state court; Wells Fargo has agreed in essence to stand down pending this court's ruling. In the interim, after having had an opportunity to investigate the State Court Action, the chapter 7 trustee has abandoned any interest and filed a second no-asset report. He therefore does not participate in this motion.

from taking any other action to interfere with Wells Fargo's rights to foreclose the N. Willow properties; (4) enforcing Ruby's "sworn promise" to surrender 317 N. Willow to Wells Fargo; and (5) in the alternative, ordering Ruby to reaffirm Wells Fargo's debt or to redeem the property.[25] Ruby responded with an objection and a cross-motion to enjoin Wells Fargo from filing pleadings in the State Court Action pending the chapter 7 trustee's determination of whether the State Court Action is an asset of the bankruptcy estate.[26] The parties agreed to submit both motions to the court based on stipulated facts and briefs.[27] For the reasons stated below, the court denies Wells Fargo's Motion.

*Discussion*

Wells Fargo argues that when a chapter 7 debtor signs a statement of her intention to surrender property, the debtor is effectuating a relinquishment of control and possession of the property *to* the secured creditor. Wells Fargo argues that for a debtor to later take any action in state court asserting ownership of the property is contrary to her representation to the bankruptcy court in the statement of intention. Wells Fargo argues a debtor's failure to relinquish possession and control of the surrendered property is an abuse of the bankruptcy system, and that this court has authority in effect to enforce the surrender. Finally, Wells Fargo argues that the overwhelming majority of courts, including courts in this district, follow its interpretation of the law.

Ruby counters that she did not surrender the property and cannot be compelled to do so when there is a non-debtor party (daughter Rita) who is not before the court, and that Ruby is not

---

[25] It should be noted that redemption under § 722 only applies to personal property.

[26] Ruby originally objected to the motion to compel, raising solely a procedural defense that the motion to compel needed to be in the form of an adversary complaint. The court overruled that objection, and granted Ruby additional time to submit a substantive response.

[27] At a status conference, Wells Fargo agreed voluntarily not to take further action in state court pending this court's determination. In the interim, the chapter 7 trustee filed an abandonment of any interest in the State Court Action. Ruby's motion to enjoin will therefore be denied as moot in a separate order to be issued by the court.

contesting a foreclosure action but seeking to enforce her rights in the properties in light of Wells

Fargo's errors in the legal description and lien release. She also argues that § 521(a)(2) is a

notice provision only, and that nothing in § 521 prevents her from exercising her state law rights

to sue Wells Fargo for trespass and other theories. The court agrees with Ruby.

*Introduction: Section 521(a)(2)*

The court starts with the language of the Code.

Section 521(a)(2)(A) provides in relevant part that an individual debtor whose schedules

include debts secured by property of the estate shall "file with the clerk a statement of his

intention with respect to the *retention or surrender* of such property and, if applicable, specifying

that such property is claimed as exempt, the debtor intends to redeem such property, or that the

debtor intends to reaffirm debts secured by such property."[28] Section 521(a)(2)(B) also requires

the debtor to "perform his intention with respect to such property" within a certain time. But in

what has been described as another BAPCPA "hanging paragraph,"[29] and in essence a savings

clause, § 521(a)(2) goes on to provide: "[E]xcept that nothing in subparagraphs (A) and (B) of

this paragraph shall alter the debtor's or the trustee's rights with regard to such property under

this title, except as provided in section 362(h)." The Code also expressly tasks the chapter 7

trustee with "ensur[ing] that the debtor shall perform his intention as specified in section

521(a)(2)(B)."[30]

---

[28] 11 U.S.C. § 521(a)(2)(A) (emphasis added).

[29] So-called because it "hangs" after a separately enumerated part or section. *See, e.g.*, § 1325(a) (treatment of 910 car claims); § 523(a)(18) (definition of a return).

[30] 11 U.S.C. § 704(a)(3). As the leading bankruptcy treatise notes, Congress also vested chapter 13 trustees with a § 704(a)(3) duty, and provided that a chapter 13 case be dismissed for a debtor's failure "to timely file the information required by paragraph (2) of section 521(a)." 11 U.S.C. §§ 1302(b)(1), 1307(c)(10). Chapter 13 debtors are not required to file statements of intention since § 521(a)(2)(A) expressly applies only to chapter 7 debtors. Thus, these provisions are meaningless in a chapter 13. 4 COLLIER ON BANKRUPTCY ¶ 521.14[2] n.3 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

Redemption of certain personal property is governed by § 722; reaffirmation of debts by § 524. The Code does not contain a separate section for surrender, however. Nor does the Code define the phrase "retention or surrender," specify what is required for a debtor "to perform his intention," or specify how a chapter 7 trustee should ensure performance of the intention. Given that Congressional intent is not apparent from the plain language of these sections, the court must turn to other sources to determine what "surrender" means in the context of § 521.

### At the Threshold, a Discussion of the History of § 521(a)(2)

Courts have expended much ink and brain power on § 521(a)(2) and its predecessor, § 521(2). A discussion of what Congress meant when it used the term "surrender" must therefore begin with this history.

Congress first imposed the duty to file statements of intention and to perform the intention in the 1984 amendments.[31] The language of then § 521(2) is nearly identical to the current version, § 521(a)(2), except that § 521(2) originally applied only to debtors with secured consumer debts.[32] As courts explained at the time, secured creditors were frustrated by expending costs to file motions for relief from stay only to determine that some debtors intended to reaffirm their home mortgage or redeem their car.[33] This legislative history, and the fact that § 521(2) contained no express enforcement mechanism, led the majority of courts to conclude that § 521(2) functioned primarily as a notice provision.[34]

Yet secured creditor frustration did not abate. Creditors argued that § 521(2) afforded debtors only three options: reaffirmation, redemption, or surrender of the collateral. Seizing on

---

[31] Bankruptcy Amendments and Federal Judgeship Act of 1984 § 305, Pub. L. No. 98-353, H.R. 5174 (1984).

[32] Other differences between §§ 521(a)(2) and 521(2) are discussed *infra*.

[33] *E.g., In re Belanger*, 118 B.R. 368, 370–71 (Bankr. E.D.N.C. 1990).

[34] *See, e.g., In re Boodrow*, 126 F.3d 43, 50–51 (2d Cir. 1997); *In re Price*, 370 F.3d 362, 375 (3d Cir. 2004); *In re Mayton*, 208 B.R. 61, 67–68 (B.A.P. 9th Cir. 1997); *In re Irvine*, 192 B.R. 920, 921 (Bankr. N.D. Ill. 1996); *In re Parker*, 142 B.R. 327, 329 (Bankr. W.D. Ark. 1992).

the phrase "if applicable," however, debtors argued that the ambiguity in § 521(2) and lack of a plain statutory remedy offered a fourth option – that of keeping the collateral without reaffirming or redeeming, so long as they remained current on payments.[35] Under this option, the debtor – having extinguished any personal liability on the loan with his discharge – could continue to drive the car or live in the house while he was current. But if the debtor later decided to give up the car, for example, the lender was limited to repossessing the depreciated vehicle; the discharge injunction prevented the lender from suing the debtor to recover any deficiency.

This fourth option – sometimes called the option to "retain and pay" or to "pay and drive" – eventually became known as "ride-through." Ride-through derived its force from the fact that the Code as well as case law invalidated "*ipso facto*" clauses, so that a lender could not rely on the mere filing of the bankruptcy to declare default and repossess or foreclose.[36]

The courts were violently split on the issue of ride-through, resulting in "retain-and-pay"[37] and "no-retain-and-pay" [38] camps, and the pre-BAPCPA case law reflects the struggles

---

[35] The Third Circuit in *In re Price*, the last circuit court to address the issue before the BAPCPA amendments of 2005, explains the statutory construction problem with § 521(2) this way:

> We begin with the pertinent text of section 521(2)(A). Congress has mandated that a debtor must file a statement of intention with respect to the retention or surrender of such property and, *if applicable*, specifying that such property is claimed as exempt, that the debtor intends to redeem such property, or that the debtor intends to reaffirm debts secured by such property. 11 U.S.C. § 521(2)(A). The trouble lies with the phrase 'if applicable.' Do those words merely indicate that the three options – exemption, redemption, and reaffirmation – are relevant when a debtor intends to retain and not applicable when a debtor chooses to surrender the collateral? If so, section 521(2)(A) sets out an exhaustive set of retention options. Or, does 'if applicable' mean 'if' the debtor wishes to choose any of the three options that follow on its heels, i.e., when redemption, reaffirmation, and exemption 'apply,' that intention must be specifically stated? If the latter construction is correct, then section 521(2)(A) leaves available other methods of retention, such as by keeping the loan current.

370 F.3d 362, 370 (3d Cir. 2004) (internal quotations omitted).

[36] An *ipso facto* clause is a provision in an underlying agreement that has the effect of placing the debtor in default by reason of the occurrence, pendency or existence of a bankruptcy or insolvency proceeding. *See, e.g., In re Lopez*, 440 B.R. 447, 448 n.2 (Bankr. E.D. Va. 2010).

[37] As explained in *In re Park*er, the analysis is actually more nuanced:

many courts had with this issue. The lack of a clear enforcement mechanism in § 521(2) also

complicated matters; some courts held that a creditor could not compel a debtor to surrender

since the debtor's duty was limited to filing the statement of intent and a creditor could not be

compelled to reaffirm.[39] Other courts said a creditor's remedy was to move to lift the stay.[40] This

court is not aware of any courts during this period, however, that ordered a debtor to perform the

intention to surrender property to a creditor in the way Wells Fargo seeks to do now.

Against this backdrop, Congress enacted the Bankruptcy Abuse Prevention and

Consumer Protection Act ("BAPCPA") in 2005.[41] It was widely reported that one of the abuses

Congress intended to fix was the ride-through loophole. And Congress did add a number of

---

The Second, Fourth, and Tenth circuits have held that debtors who are current on their loan payments on secured property may elect to retain the property and make the payments specified in the contracts with the creditor. *In re Boodrow*, 126 F.3d at 53; *Home Owners Funding Corp. v. Belanger (In re Belanger)*, 962 F.2d 345, 347 (4th Cir. 1992); *Lowry Fed. Credit Union v. West*, 882 F.2d 1543, 1547 (10th Cir. 1989). After a thorough review of the extant case law, the Second Circuit held that the statute "appears to serve primarily a notice function, not necessarily to restrict the substantive options available to a debtor who wishes to retain collateral security a debt." *In re Boodrow*, 126 F.3d at 51. The Fourth Circuit concluded that the words 'if applicable' meant that there are other options available to the debtor. *In re Belanger*, 962 F.2d at 348. The Tenth Circuit decided that the plain language of the statute was mandatory, but as the statute gives no power of enforcement, the bankruptcy court, in its discretion may allow the debtor to keep possession of the property and continue to make payments: "[A]lthough we regard as mandatory the provisions of [§ 521], we do not believe these provisions make redemption or reaffirmation the exclusive means by which a bankruptcy court can allow a debtor to retain secured property." *In re Lowry*, 882 F.2d at 1547.

139 F.3d 668, 672 (9th Cir. 1998).
[38]

The Fifth, Eleventh, and Seventh circuits disagree, holding that once the debtor decides to retain rather than surrender the property, he is restricted to the 'applicable' options of claiming an exemption, redeeming the property, or reaffirming the debt. *Johnson v. Sun Fin. Co. (In re Johnson)*, 89 F.3d 249, 252 (5th Cir. 1996) (per curiam); *Taylor v. AGE Fed.Credit Union (In re Taylor)*, 3 F.3d 1512, 1516 (11th Cir. 1993); *In re Edwards*, 901 F.2d 1382, 1387 (7th Cir. 1990). "Permitting a debtor to retain property while keeping up installment payments without a reaffirmation of personal liability allows a debtor to force a new arrangement on a creditor." *Id.* at 1386.

*Parker*, 139 F.3d at 672.
[39] *See, e.g., In re Turner*, 156 F.3d 713 (7th Cir. 1998).
[40] *See, e.g., In re Donnell*, 234 B.R. 567 (Bankr. D.N.H. 1999).
[41] Pub. L. No. 109-8, 119 Stat. 23 (2005).

provisions related to an individual debtor's rights and duties with respect to secured debts. Those amendments

- expanded the individual debtor's duty to file a statement of intention to all secured debts, not just consumer ones[42]

- shortened the time for the debtor to perform the intention[43]

- added a new debtor duty to "not retain possession" of certain personal property unless the debtor timely reaffirmed the debt or redeemed the property[44]

- added a "penalty" for violations of the duty not to retain possession by providing for an automatic lift of stay before the discharge[45]

- added a separate provision in § 362(h) lifting the stay when the debtor either failed to timely file the statement of intention with respect to certain personal property or failed to "take timely the action"[46]

- modified the savings clause in § 521(a)(2) to make it subject to § 362(h)[47]

---

[42] § 521(a)(2)(A).

[43] From 45 days after filing the statement of intent (which was due 30 days after the bankruptcy filing) to 30 days "after the first date set for the meeting of creditors." § 521(a)(2)(B).

[44]

> In a case under chapter 7 of this title in which the debtor is an individual, [the debtor shall] not retain possession of personal property as to which a creditor has an allowed claim for the purchase price secured in whole or in part by an interest in such personal property unless the debtor, not later than 45 days after the first meeting of creditors under section 341(a), either –
> (A) enters into an agreement with the creditor pursuant to section 524(c) with respect to the claim secured by such property; or
> (B) redeems such property from the security interest pursuant to section 722.

§ 521(a)(6).

[45] The hanging paragraph falling after § 521(a)(7) provides that, "[i]f the debtor fails to act within the 45-day period referred to in paragraph (6), the stay under section 362(a) is terminated with respect to the personal property of the estate or of the debtor which is affected, such property shall no longer be property of the estate, and the creditor may take whatever action as to such property as is permitted by applicable nonbankruptcy law . . . ."

[46] § 362(h).

[47] § 521(a)(2)(B). The savings clause now provides "except that nothing in subparagraphs (A) and (B) of this paragraph shall alter the debtor's or the trustee's rights with regard to such property under this title, except as provided in section 362(h)."

- validated the enforcement of *ipso facto* clauses in certain circumstances related to certain personal property[48]

- authorized secured creditors with an interest in the debtor's principal residence to seek or obtain periodic payments "associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien."[49]

If Congress intended to abrogate ride-through with these changes, its efforts failed. Most courts agree that these changes, when read together, have for the most part eliminated ride-through on personal property, since a debtor's rights under the savings clause are now subject to the stay-lifting provisions of § 362(h).[50] But as far as under what circumstances the stay lifts, when it lifts, the impact of the invalidation of *ipso facto* clauses, and other issues arising out of this spaghetti-tangle of Code provisions, courts continue to disagree,[51] and for good cause: Congress did not materially change the language of former § 521(2)(A); did not remove the offending "if applicable" language; did not define "retention or surrender"; and did not specify what is required to "perform an intention."

Most importantly, the new duty "not to retain" and the new "penalties" (lift of stay and validation of the *ipso facto* clause) for retaining without reaffirming expressly apply only to a debtor's retention of personal property. Conversely, the express Congressional blessing of a

---

[48] § 521(d) ("If the debtor fails timely to take the action specified in subsection (a)(6) of this section, or in paragraphs (1) and (2) of section 362(h) . . . nothing in this title shall prevent or limit the operation of a provision in the underlying lease or agreement that has the effect of placing the debtor in default under such lease or agreement by reason of the occurrence, pendency, or existence of a proceeding under this title or the insolvency of the debtor.")
[49] § 524(j).
[50] *See, e.g., Dumont v. Ford Motor Credit Co. (In re Dumont)*, 581 F.3d 1104 (9th Cir. 2009); *In re Miller*, 443 B.R. 54 (Bankr. D. Del. 2011); *In re Donald*, 343 B.R. 524 (Bankr. E.D.N.C. 2006). *But see Coastal Fed. Credit Union v. Hardiman*, 398 B.R. 161, 186 (E.D.N.C. 2008) (limited ride-through option for personal property post-BAPCPA, also known as back-door ride-through).
[51] *E.g., In re McMullen*, 443 B.R. 67 (Bankr. E.D.N.C. 2010) (discussing issues with when the stay lifts pursuant to § 362(h)). There are also splits of authority with respect to nearly all of the ride-through BAPCPA amendments.

14

creditor's ability to accept mortgage payments appears to codify ride-through for a debtor's home mortgage.[52]

***Turning Back to the Parties' Arguments in this Case***

It is somewhat difficult to follow Wells Fargo's arguments about surrender. Wells Fargo both argues that Ruby has no ownership in the Willow properties because she already "surrendered" the properties (as though Wells Fargo now owns the properties), and also argues that that she should be compelled to surrender them. These verbal gymnastics do not help the court determine what § 521(a)(2) means. So the court will take each of Wells Fargo's arguments in turn.

***§ 521(a)(2) Does Not Effectuate a Surrender; § 521(a)(2) is a Notice Statute***

Wells Fargo's first argument is that § 521(a)(2) substantively effectuated a surrender of the N. Willow Properties, because Congress intended § 521(a)(2) to operate as something more than a notice statute. The court disagrees.

Returning to the interpretation of § 521(a)(2) and the meaning of the phrase "retention or surrender," the only logical way to interpret the word "surrender" is in contrast to what Congress thought was its opposite – "retention." The plain meaning of "retention" is to retain or keep as opposed to relinquishing or giving up. So when Ruby filed a statement of intention that she was surrendering the N. Willow properties, she expressed her intention to relinquish or to give up – as opposed to keeping – those properties.

But nothing in § 521(a)(2)(A) accomplished transferring 313 and 317 N. Willow *to* Wells Fargo, for multiple reasons. First, if § 521(a)(2)(A) effectuated a surrender upon the filing of the statement of intention, then § 521(a)(2)(B) would be superfluous – there would be no reason for

---

[52] *E.g., In re Lopez*, 440 B.R. 447 (Bankr. E.D. Va. 2010); *In re Carabello*, 386 B.R. 398, 402 (Bankr. D. Conn. 2008); *but see In re Harris*, 421 B.R. 597 (Bankr. S.D. Ga. 2010).

the Code to set a deadline for the debtor's performance of the intention. Second, there would also be no need to vest chapter 7 trustees with a duty to ensure performance of debtors' intentions. And third, the savings clause preserving debtors' and trustees' rights would be unnecessary, since neither would have any rights in the "surrendered" property. Wells Fargo's argument that § 521(a)(2) effectuated a surrender also ignores Missouri law requirements for transferring real estate.

Interpreting § 521(a)(2) to effectuate a real estate transfer would in fact deprive trustees of their statutory rights to administer property of the estate and avoid liens. And  when Congress intended that a party surrender property "to" another party, it knew how to do so: § 521(a)(4) imposes a duty on the debtor to "surrender *to the trustee* all property of the estate . . . ." (emphasis added).[53]

For all these reasons, "surrender" in the phrase "retention or surrender" cannot mean surrender *to* Wells Fargo; indeed, both parties here ultimately reach a similar definition of surrender as being merely a relinquishment, which is consistent with the definition reached by the majority of courts.[54]

The focus then must be on what it means for a debtor to "perform the intention," and what happens when a debtor does not perform, a nuance both parties have overlooked. Here is where the BAPCPA amendments and the pre-BAPCPA case law must be viewed together, and the obvious question asked: given that a majority of courts and the leading commentator[55]

---

[53] *Compare* § 521(a)(2)(A) with § 1325(a)(5)(C) (with respect to treatment of secured claims in a chapter 13 plan, authorizing a plan treatment option that allows the debtor to surrender "the property securing such claim to such holder").

[54] *See, e.g., In re Corter*, 390 B.R. 648, 652 (Bankr. W.D. Mo. 2008 (*quoting In re Stone*, 166 B.R. 621, 623 (Bankr. S.D. Tex. 1993)).

[55] 4 COLLIER ON BANKRUPTCY ¶ 521.14[5] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). COLLIER still takes the view that § 521 (a)(2) operates as a notice statute, even after the passage of BAPCPA.

viewed § 521(a)(2) as a notice statute, did Congress intend for the BAPCPA amendments to change § 521's interpretation with respect to home mortgages? The logical answer is no.

First, the amendments related to ride-through did not change other provisions of the Code governing Ruby's and Wells Fargo's respective rights in the N. Willow properties throughout the bankruptcy case. All legal and equitable interests Ruby had with respect to the N. Willow properties became property of the estate under § 541(a) and Wells Fargo was automatically stayed from enforcing its liens under § 362(a). The Code also vested Ruby with certain limited avoidance powers with respect to these properties under § 522(f) and (g). Ruby timely filed a statement of intention to surrender, and did not oppose Wells Fargo's motion to lift the stay to allow Wells Fargo, as it put it, to "seek the return of [the] property." Ruby received a discharge, extinguishing her personal liability under § 524. When the trustee abandoned his interests in the N. Willow properties, all of Ruby's legal and equitable interests were abandoned back to her under § 554(c) and § 521(a)(2)'s savings clause. These rights included any equitable rights Ruby might have had under Missouri law to challenge the switched legal descriptions.

Second, the reason Ruby had a fourth option to "retain" notwithstanding her stated intention to surrender is that Congress provided that option in § 524(j), when it authorized Wells Fargo to accept periodic payments in lieu of foreclosing its in rem interest. In other words, as explained above, § 524(j) codified the ride-through option that the majority of courts recognized pre-BAPCPA with respect to home mortgages such as Ruby's.

The Code thus sets up a dichotomy in treatment between creditors with liens in personal property and creditors with liens in real estate, particularly home mortgages. Yet, the Code has long drawn distinctions between secured creditors depending on the nature of their security.[56]

---

[56] *See, e.g.,* § 522(f) (allowing for avoidance of only certain types of liens).

The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially-created concept, it makes that intent specific. Courts have followed this rule with particular care in construing the Bankruptcy Code.[57] The court therefore rejects Wells Fargo's argument that § 521(a)(2) effectuated a surrender of the N. Willow properties to Wells Fargo. The court also rejects Wells Fargo's argument that the Code required Ruby to do anything other than file a statement of intention with respect to the N. Willow properties and to "perform." Wells Fargo's remedy for Ruby's failure to perform was the remedy it chose, to move from relief from stay. The court therefore concludes that § 521(a)(2) continues to operate as a notice statute with respect to home mortgages.[58]

### Wells Fargo's Argument that Ruby has Asserted a Contrary Position in State Court

Wells Fargo next asserts that by making a "sworn promise" to surrender the N. Willow properties in the bankruptcy court, Ruby cannot take a contrary position in the State Court Action and this court should therefore "enforce" the sworn promise. Wells Fargo appears to suggest that the statement of intention is a contract, the breach of which entitles it to the contractual remedy of specific performance. For the reasons set forth below, the court rejects Wells Fargo's argument in part, and on its own motion abstains in part.

First, the court rejects Wells Fargo's argument that Ruby's statement of intention was a "sworn promise" to surrender the N. Willow properties. The statement of intention itself belies the notion that it created an enforceable contract. A filed statement of intention (Official Form 108) is indeed executed under penalty of perjury,[59] but here states literally that Ruby's *intent* as

---

[57] *In re Montoya*, 333 B.R. 449, 457 (Bankr. D. Utah 2005).
[58] The court need not decide whether § 521(a)(2) operates as a notice statute with respect to secured personal property.
[59] Rule 1008; 28 U.S.C. § 1746.

of April 25, 2012 was to surrender 317 N. Willow and 313 N. Willow ("Lot with Abandoned Structure").

Second, statements of intention are just that – of intent. Debtors have limited rights to amend their statements of intention.[60] It is hornbook law that expressions of intent, which by definition may be changed, do not give rise to an enforceable contract.[61] Thus, the argument that the statement of intention is somehow a "promise" which gives rise to some right to damages for breach or enforcement in the nature of a contract right is not supported by the Official Form itself or by the statement Ruby actually signed.[62]

What Wells Fargo is in essence arguing is that Ruby – having converted her case on a representation she was surrendering her home and signing a statement of intention to that effect – should be judicially estopped from taking a contrary position in the State Court Action.

Judicial estoppel is an equitable doctrine created to protect the integrity of the judicial process.[63] Judicial estoppel prevents a party from taking a position in one court that is contrary to a position taken in another court.[64] A court applying judicial estoppel considers three factors: whether a party's later position is "clearly inconsistent with its earlier position"; "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the

---

[60] The Code expressly references amendments of statements of intention with respect to personal property. *See* § 362(h)(1)(B) (referencing that statement "as it may be amended . . ."). And Rule 1009(b) expressly grants a debtor a limited right to amend the statement within the time period provided in § 521(a).

[61] *See, e.g., Matthews v. City of Memphis*, 14-cv-2094, 2014 WL 3049906, at *5 (W.D. Tenn. July 3, 2014).

[62] Judicial estoppel may be appropriate based on actions that are inconsistent with a statement of intent. However, to the extent Wells Fargo could make this argument, the proper place to do so is in the State Court Action, and not here. *See In re Guerra*, 544 B.R. 707, 711 (Bankr. M.D. Fla. 2016).

[63] *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).

[64] *Id*. at 749.

opposing party if not estopped."[65] The determination of whether to apply judicial estoppel is an equitable one, however, and possible defenses include inadvertence and mistake.[66]

Here, this court cannot determine based on the stipulated facts whether Ruby should be judicially estopped in the State Court Action from challenging Wells Fargo's liens. Yes, Ruby through counsel represented she was converting to chapter 7 to surrender her "home," but Ruby claimed different properties at different times as her homestead and did not describe which property she was referring to in the motion to convert. There is no evidence before this court that Wells Fargo relied on the statement in the conversion motion or was even served with the motion.

Second, there is likewise no evidence Wells Fargo relied on the statement of intention. There is no certificate of service in the court record that shows Ruby gave notice of the statement to Wells Fargo as required by Rule 1007(b)(2). And, Wells Fargo's motion for relief was already pending when the statement of intention showing surrender was filed and Wells Fargo did not amend its motion for relief to reference the statement.

Finally, and most importantly, this court cannot say it was misled by Ruby's statements in the conversion motion or the statement of intention. Other cases have found it appropriate to judicially estop a debtor where the debtor obtained a discharge notwithstanding a failure to disclose assets, for example, on the grounds the bankruptcy court in granting the chapter 13 debtors a discharge had accepted the debtors' representation that they had no undisclosed assets.[67] But performing the intention in a statement of intention is not a prerequisite to obtaining a discharge under § 727.

---

[65] *Id.* at 750-51.
[66] *Id.* at 743.
[67] *E.g., Jones v. Bob Evans Farms, Inc.*, 811 F.3d 1030, 1033–34 (8th Cir. 2016).

That being said, there are certainly inconsistencies – by both parties – in their statements to this court:  Ruby's discrepancies in which property or properties constituted Ruby's homestead and which properties she owned with Rita, and Wells Fargo's inaccurate recitation of the nature of liens, failure to serve Rita with the motion for relief, and later release of its lien. But the parties have presented no evidence regarding these inconsistencies and whether the inconsistencies were caused by inadvertence or mistake. They have presented no evidence about whether Ruby's apparent change of mind about keeping the home was inspired by Wells Fargo's lien release or something else. The court therefore believes that it is the state court that is in the best position to determine whether either party should be judicially estopped with respect to their respective positions, particularly given that this court has no jurisdiction over the parties' state law claims.[68]

In sum, the court denies Wells Fargo's request to compel Ruby to surrender or to otherwise comply with the statement of intention, and abstains[69] from any determination about whether either party should be judicially estopped with respect to positions taken in the State Court Action.

***Ruby's Failure to Relinquish Possession and Control of the N. Willow Properties is Not an Abuse of the Bankruptcy System***

Wells Fargo argues that Ruby's failure to relinquish possession and control of the N. Willow properties is an abuse of the bankruptcy system, such that this court should employ its equitable powers to require her to reaffirm its debt, redeem the properties, or, in the alternative, vacate her discharge and enjoin her from pursuing the State Court Action. The court disagrees.

---

[68] 28 U.S.C. § 1334(b); *Specialty Mills, Inc. v. Citizens State Bank*, 51 F.3d 770, 773-74 (8th Cir. 1995)(discussing when a matter is sufficiently related to the bankruptcy proceeding to be a "related to" proceeding for purposes of "related to" jurisdiction; adopting the so-called *Pacor* test, from *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d. Cir. 1984)). *See also In re Kourogenis*, 539 B.R. 625, 631 (Bankr. S.D. Fla. 2015) ("Federal courts simply cannot intervene" to tell a state court how to use its judicial discretion).
[69] 28 U.S.C. § 1334(c)(1).

Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Section 105(a) powers are not, however, to be employed in contravention of express provisions of the Bankruptcy Code.[70]

Section 524(c)(1) requires that any reaffirmation agreement be entered "before the granting of the discharge." Rule 4008 sets a deadline to file a reaffirmation agreement "no later than 60 days after the first date set for the meeting of creditors . . . ." Many courts recognize authority to vacate a discharge order for the purpose of filing reaffirmation agreements.[71] Regardless of that authority, however, Wells Fargo cites no authority requiring a debtor whose debt has been discharged some seven years hence to now reaffirm a debt; to do so would contravene § 524(c)(3)(A)'s requirement that reaffirmation agreements be voluntary.[72]

Likewise, the court has no authority to require a debtor to redeem real property under § 722 since that section applies solely to personal, not real, property. And, there is certainly no authority to vacate or even deny a discharge for an alleged "failure to surrender"; the grounds to deny or revoke a discharge are expressly set forth in § 727 and none of the grounds even refer to filing or performing a statement of intention.[73]

The court, in sum, does not have the equitable power to compel Ruby to reaffirm Wells Fargo's debt, to order her to redeem, or to vacate her discharge, since all of those requests contravene express provisions of the Code. The court likewise does not have authority to enjoin Ruby from pursuing her State Court Action, since § 105(a) powers are limited to those necessary

---

[70] *Law v. Siegel*, 134 S. Ct. 1188, 1194 (2014).

[71] *See, e.g., In re Edwards*, 236 B.R. 124, 127 (Bankr. D.N.H. 1999) (motions to vacate discharge for purposes of filing a reaffirmation agreement allowed upon showing of special circumstances). *But see In re Rigal*, 254 B.R. 145 (Bankr. S.D. Tex. 2000) (no authority to vacate discharge to allow for filing of a reaffirmation agreement).

[72] A reaffirmation agreement, to be enforceable, must be a "fully informed and voluntary agreement by the debtor." A creditor likewise cannot be compelled to accept a reaffirmation agreement from a debtor. *E.g., Matter of Turne*r, 156 F.3d 713 (7th Cir. 1998).

[73] *In re Ryan*, 560 B.R. 339, 351 (Bankr. D. Haw. 2016), appeal docketed, No. HI-16-1391 (B.A.P. 9th Cir. Nov. 2, 2016).

to carry out the provisions of title 11, and Ruby's actions in state court do not implicate any Code provisions.

As a final matter, even if this court had such equitable powers, it would not employ them in this case. Ruby signed a statement indicating her intention to surrender the N. Willow properties five years ago; Wells Fargo in turn obtained relief from stay on the grounds it intended to seek return of the property. Yet Wells Fargo has still not foreclosed and in fact released a portion of its lien. After the release and seeming inaction on the part of Wells Fargo, Ruby seeks a declaration of her rights and other damages arising out of that lien release. For her to do so in no way abuses the bankruptcy system.

### The Majority of Courts and Previous Cases in This District do not Support Wells Fargo's Position

Wells Fargo's final argument is that by reason of the overwhelming weight of authority, this court should grant its motion. Wells Fargo has not accurately reported the state of the law.

First, the majority of cases do not support Wells Fargo's interpretation of the meaning of "surrender." The term is used in many provisions of the Code and in many contexts, and citing cases interpreting whether a debtor may surrender property to a creditor in the context of a chapter 13 plan, for example,[74] is not necessarily determinative of the effect of a debtor's intention to surrender in a chapter 7 and pursuant to § 521(a)(2).

Second, Wells Fargo's argument that the Western District of Missouri has decided this issue is disingenuous. It is true that two bankruptcy judges in this district rejected ride-through pre-BAPCPA.[75] But Wells Fargo neglects to note that a third judge expressly disagreed with his

---

[74] *See* § 1325(a)(5)(c) ("surrender . . . to" a creditor).
[75] *In re Gerling*, 175 B.R. 295 (Bankr. W.D. Mo. 1994) (Federman, J.); *In re Podnar,* 307 B.R. 667, 670 n.3 (Bankr. W.D. Mo. 2003) (Venters, J.).

colleagues and determined ride-through was permissible.[76] In any event, those fraternal disagreements are irrelevant – Congress changed the law.

Next, Wells Fargo cites a post-BAPCPA case, *In re Carter*,[77] for the proposition that § 521(a)(2) means that a debtor must surrender collateral "to" the secured creditor. Wells Fargo's reliance on this case is, again, misplaced.

*Carter,* another case by my esteemed colleague Judge Federman, is a chapter 13 case. In *Carter*, the debtor proposed a plan to surrender certain real property "in lieu" of the first and second lienholder's claims. The plan was confirmed without objection. Later, the second lienholder objected to the chapter 13 trustee's notice to allow claims, arguing that it was entitled to file an unsecured deficiency claim once the first lienholder foreclosed.[78] The court disagreed.

In discussing the effect of the confirmed plan, *Carter* reasons that "the term 'surrender' was contemplated by Congress to be a return of property and a relinquishing of possession or control to the holder of the claim."[79] Yet *Carter* goes on to say something important that Wells Fargo conveniently omits: that "[t]he statute does not require a debtor to transfer title by executing and delivering a deed in order to effectuate surrender."[80] *Carter* correctly held that the effect of a confirmed plan under § 1327 appropriately bound the creditor from asserting an unsecured deficiency claim.[81] That is far from Wells Fargo's proposition that a statement of intention filed in a chapter 7 case must be "enforced" by an injunction years later under the circumstances of this case, in which a debtor is pursuing state court remedies arising from an

---

[76] *In re Canady-Houston*, 281 B.R. 286 (Bankr. W.D. Mo. 2002) (Koger, J.).
[77] *In re Carter*, 390 B.R. 648 (Bankr. W.D. Mo. 2008).
[78] *Id.* at 650.
[79] *Carter,* 390 B.R. at 652 (citation omitted).
[80] *Id.* (citations and internal quotations omitted).
[81] *Id*. at 654.

admitted release of lien and alleged trespass. In sum, the court agrees with the result in *Carter,* but that result is simply inapposite to this case.

Finally, Wells Fargo relies most heavily on the Eleventh Circuit's recent *Failla* case.[82] For several reasons, the court declines to follow *Failla* and concludes its reasoning does not apply in the context of this case.

Superficially, *Failla* would seem to have great appeal.

In *Failla*, the debtors' lender had commenced a judicial foreclosure action against the debtors' Florida home before they filed their chapter 7 bankruptcy. The debtors' chapter 7 bankruptcy filing automatically stayed the state court foreclosure action. According to the Eleventh Circuit, the debtors admitted in the bankruptcy proceeding that they owned the home, that the house was collateral for a mortgage, and that the balance of the mortgage exceeded the value of the home.[83] The debtors' statement of intention indicated that they intended to surrender the home, and, based on the negative value, the chapter 7 trustee abandoned his interest. After their discharge and the abandonment, however, the debtors continued to live in the house while opposing the judicial foreclosure.

The lender filed a motion with the bankruptcy court to compel surrender of the home, and the bankruptcy court granted the motion.[84] The bankruptcy court also ordered the debtors to stop opposing the foreclosure action. The district court affirmed the bankruptcy court's ruling,[85] and debtors appealed to the Eleventh Circuit. The Eleventh Circuit likewise affirmed.

---

[82]  *In re Failla*, 838 F.3d 1170 (11th Cir. 2016). Wells Fargo cites several other Florida bankruptcy cases, but they are all from bankruptcy courts that are bound to follow *Failla* and therefore do not independently carry any persuasive weight.
[83] *Failla,* 838 F.3d at 1173.
[84] 529 B.R. 786 (Bankr. S.D. Fla. 2014).
[85] 542 B.R. 606 (S.D. Fla. 2015).

The Eleventh Circuit divided its discussion into two parts. It first held that § 521(a)(2) "prevents debtors who surrender their property from opposing a foreclosure action in state court."[86] Second, it found that the bankruptcy court had authority to compel the debtors to desist from opposing the lender's foreclosure action under § 105(a).[87]

The Eleventh Circuit in *Failla* held true to its pre-BAPCPA ride-through decision in *Taylor,*[88] which had determined that § 521(2) did not permit ride-through but required "surrender." The *Failla* court also upheld the bankruptcy court's authority under § 105(a) to prevent abuses in its court. The ruling in *Failla* does not, however, support Wells Fargo here, for several reasons.

First, the Eighth Circuit, unlike the Eleventh Circuit, does not have pre-BAPCPA law informing its interpretation of § 521(a)(2).  Second, ride-through of home mortgages is now permitted – an argument apparently not raised in *Failla*. And third, this court has found, unlike the bankruptcy court in *Failla,* that Ruby did not abuse the bankruptcy process. Here, there was no pre-bankruptcy foreclosure. Here, Ruby originally filed a chapter 13 bankruptcy in an attempt to keep her home. Here, Wells Fargo obtained stay relief, but did not foreclose. And here, Wells Fargo has filed a deed of release.

Under the circumstances in *Failla*, the Eleventh Circuit could certainly conclude that opposing the foreclosure was in effect an impermissible ride-through in violation of the debtors' duties under *Taylor*. It follows then, that it was appropriate for the circuit court to affirm the bankruptcy court's use of equitable powers to enforce the debtors' duty to reaffirm or surrender.

---

[86] *Failla*, 838 F.3d at 1174.
[87] *Id.*
[88] *In re Taylor*, 3 F.3d 1512 (11th Cir. 1993).

26

A more recent case, *In re Ryan*,[89] sets forth persuasive reasons under similar circumstances (and following Ninth Circuit pre-BAPCPA law allowing ride-through) why *Failla* is incorrect. But, this court need not decide whether there might be circumstances under which it might be appropriate to exercise § 105(a) powers: in this case, Ruby is not opposing a state court foreclosure action and there is another interested party (Rita) over whom this court has no authority or jurisdiction. Thus, the *Failla* case, even if correctly decided, does not apply under the facts here.

### Conclusion

The court can envision rare situations, during the pendency of a chapter 7 case, in which it might be appropriate to use its § 105(a) powers to compel a debtor to do *something* in connection with a statement of intention or to somehow enforce performance of the intention in the statement, particularly with respect to personal property. In this case, however, Wells Fargo obtained relief from stay during the bankruptcy case, reciting a need for immediate relief "to prevent irreparable harm," and yet did not (and has still not) foreclosed; Wells Fargo through agents allegedly intruded upon property after arguably releasing a lien; and Wells Fargo obtained relief from stay based on arguably inaccurate facts and without service on all proper parties. Wells Fargo cites no statutory or legal authority supporting a result that would enjoin Ruby or prevent her from having her day in state court.

The court therefore denies Wells Fargo's Motion to Compel. The court abstains from determining whether either party should be judicially estopped based on positions taken in the bankruptcy court. Given that the chapter 7 trustee has been informed of the State Court Action and has abandoned any interest of the estate in such action, the court also directs the clerk to enter an order reclosing the case.

---

[89] 560 B.R. 339.

A separate order shall issue.

Date: 6/14/2017                          */s/ Cynthia A. Norton*
                                         Cynthia A. Norton
                                         United States Chief Bankruptcy Judge